United States District Court
Southern District of Texas
**ENTERED**
July 08, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| UNITED STATES § | |
| § | |
| v. § | Criminal Action No. 7:24-CR-01069-3 |
| § | |
| OSVALDO SAUL GALVAN § | |

## MEMORANDUM OPINION AND ORDER

On March 19, 2024, Agents Aaron Valadez and Eric Lerma from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") went to Defendant Osvaldo Galvan's home and asked to speak with him. Just minutes into the interaction, Valadez told Galvan that if he had come there to arrest him, Valadez would be in a vest and Galvan would be in handcuffs. Instead, Valadez informed him that he just wanted to talk to him and leave.

And that's what happened. Valadez and Lerma spoke with Galvan in front of his home for approximately 47 minutes, told him repeatedly that they were interested in bigger fish, did not restrain him at any point, and said several times that Galvan was not going to be arrested that day. Galvan then went back inside his house, and the agents left. The agents, however, did not give Galvan a *Miranda* warning.

Galvan now contends that he was in custody during the March 19 interview and that the un-*Mirandized* statements he made are inadmissible. Before the Court is Defendant's Motion to Suppress. (Dkt. No. 59). For the reasons below, the Court **DENIES** the Motion.

I.  **BACKGROUND**

In the summer of 2023, ATF began investigating a straw-purchasing ring. (Dkt. No. 105 at 21–22). Straw purchasing involves buying a gun on behalf of someone who is either prohibited by law from possessing one or who does not want their name associated with the transaction. (*Id.*). During the investigation, agents identified Osvaldo Galvan as a suspected straw purchaser. (*Id.* at 63).

On March 19, 2024, ATF agents Valadez and Lerma conducted a "knock and talk" at Galvan's house. (*Id.* at 26–27). Valadez conducted most of the interview and was wearing plain clothes with his duty weapon concealed.[1] (*Id.* at 28). The conversation took place just outside Galvan's home, where he lived with his parents. (*Id.*); (Dkt. No. 76-2 at 00:33:34).

The interview began cordially, with Valadez explaining that he was looking into a "paperwork discrepancy" on some gun purchases. (Dkt. No. 76-2 at 00:01:26–00:01:53). Valadez assured Galvan that "[i]f I were here trying to, like, arrest somebody, I'd be here, like, with a vest on putting you in handcuffs. But I'm—I want to talk to you, and then I want to leave. That's what I'm going to do, okay?" (*Id.* at 00:02:19–00:02:25).

After a few minutes of questioning, Valadez came to believe that Galvan was lying. (Dkt. No. 105 at 38). So Valadez warned Galvan about the consequences of lying to federal officers, explaining that it is potentially a felony under 28 U.S.C. § 1001. (Dkt. No. 76-2 at 10:03–11:30). Valadez cautioned Galvan that "if you were to continue to lie to me,

---

[1] It is unclear from the record whether Lerma was also in plain clothes with his weapon concealed.

man, the next time I come and talk to you, man, we're going to have to put you in handcuffs, and you're going to have to go to jail for a good while, okay." (*Id.* at 00:13:20–00:13:28). Yet even while delivering this warning, Valadez emphasized that he and Lerma were "just there to get some stuff to help us with our thing, and we're driving away." (*Id.* at 00:15:08–00:15:14).

This pattern continued throughout the interview. When confronting perceived dishonesty, Valadez would admonish Galvan but pair his warnings with reassurances that Galvan was not going to be arrested. At one point, Valadez explained, "If I wanted to, we could take you to jail. I don't care to do that." (*Id.* at 00:24:03–00:24:15). Minutes later, he reinforced this message: "I'm here in good faith just trying to work with you, okay. If I wasn't here in good faith, I'd be knocking on your door saying, 'Police with a search warrant, come to the door,' okay? 'Police with an arrest warrant, come to the door.' I'm not here because of that, okay?" (*Id.* at 00:25:36–00:25:56).

Valadez also repeatedly stressed that his real targets were higher-level players in the organization, not Galvan himself. "I don't really care about you," he told Galvan, "because I don't think you're the one[] who [is] taking the guns to Mexico and shooting people with them. I don't think that's you." (*Id.* at 00:13:20–00:13:35). He reinforced this message later, gesturing toward someone at the top of a figurative hierarchy while explaining, "All I want is the guy up here." (*Id.* at 00:24:03–00:24:15). Agent Lerma echoed this sentiment, telling Galvan, "We're not after you." (*Id.* at 00:21:38–00:22:02).

The conversation continued in this fashion—Galvan answering Valadez's questions, and Valadez reassuring him—until Galvan's mother pulled up to the house.

3

At that point, Valadez offered to continue the conversation in his vehicle. (*Id.* at 00:34:30–00:34:33). Galvan declined but suggested moving to the carport—ostensibly to avoid the rain—which they did. (*Id.* at 00:36:02–00:36:07); (Dkt. No. 105 at 49-50). The conversation continued under the carport for about 10 minutes until Valadez concluded the interview and asked Galvan if he would go inside and get his brother, who was also a suspect. (Dkt. No. 76-2 at 00:47:19). The entire exchange lasted 47 minutes and 12 seconds. (*Id.* at 00:00:26-00:47:38). True to Valadez's repeated assurances, it ended without an arrest.

At a hearing on this Motion, Valadez testified to the following on direct examination:

- Valadez did not restrain Galvan in any way, (Dkt. No. 105 at 29);
- Valadez did not state that Galvan was required to speak with the agents, (*id.* at 48);
- Valadez did not physically contact Galvan other than perhaps a handshake, (*id.*);
- Valadez did not tell Galvan that he could not go back into his house, (*id.*);
- Valadez gave Galvan the option to move locations to avoid family embarrassment or strife, (*id.* at 49);
- the conversation moved over to the carport at Galvan's request, (*id.* at 49–50);
- Galvan never tried to walk away, (*id.* at 54);
- Galvan never said he wanted to go back inside, (*id.*);
- Galvan went inside at Valadez's request to retrieve his brother, returned outside, and felt free to go back inside while Valadez spoke with his brother, (*id.* at 52–53);
- Valadez did not have handcuffs visible and may not have been carrying them, (*id.* at 16–17); and
- Valadez was wearing plain clothes without any form of visible police insignia, (*id.* at 29).

4

These statements are all supported by or consistent with what can be heard on the audio recording of the conversation. Valadez also testified to the following on cross:

- Valadez did not ask Galvan whether he wanted to speak inside or outside of the home, (*id.* at 59–60);
- Valadez did not tell Galvan that he was free to leave, (*id.* at 60);
- Valadez did not tell Galvan that he was free not to answer any question, (*id.*);
- Valadez did not tell Galvan that he was free to end the interview, (*id.*);
- Galvan was a suspect, and they may have had enough information to arrest him by the time of the interview, though Valadez wasn't sure, (*id.* at 63); and
- Valadez did not *Mirandize* Galvan before or during the interview, (*id.* at 64).

These statements are also supported by or consistent with what can be heard on the audio recording.

A few months later, on July 23, 2024, the United States indicted Galvan on straw-purchasing charges. (Dkt. No. 1 at 2). Galvan now moves to suppress the statements he made during the March 19 interview. (Dkt. No. 59). Galvan contends that he was in custody during the interview and that the un-*Mirandized* statements are inadmissible. (*Id.* at 1–3). The United States responds that Galvan was not in custody, so a *Miranda* warning was unnecessary. (Dkt. No. 76 at 4–6).

## II.    LEGAL STANDARD

### A.    MOTIONS TO SUPPRESS

"Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation

of [his] constitutional rights." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

    **B.**    **FIFTH AMENDMENT AND THE EXCLUSIONARY RULE**

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court held that to safeguard this privilege, law enforcement officers must advise individuals of their rights before a custodial interrogation. 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). A violation of these protections can result in the exclusion of statements obtained during the interrogation. *Missouri v. Seibert*, 542 U.S. 600, 608, 124 S.Ct. 2601, 2608, 159 L.Ed.2d 643 (2004).

    **C.**    **MIRANDA CUSTODY**

But "*Miranda* warnings are due only when a suspect interrogated by the police is 'in custody.'" *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S.Ct. 457, 460, 133 L.Ed.2d 383 (1995). In assessing whether a suspect is "in custody" as contemplated by *Miranda*, "[t]he requisite restraint on freedom is greater than that required in the Fourth Amendment seizure context." *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015).

A custodial determination in the *Miranda* context involves "an objective determination, depending on the totality of the circumstances, that looks to the circumstances surrounding the interrogation and whether, given the circumstances, a reasonable person would have felt he was at liberty to terminate the interrogation and leave." *United States v. Nelson*, 990 F.3d 947, 955 (5th Cir. 2021). In other words, the court must consider whether "a reasonable person in the suspect's position would have

6

understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988).

"The reasonable person through whom [the court] view[s] the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." *Id.* Neither the officer's nor the suspect's subjective intent "is relevant to the custody determination." *United States v. Chavira*, 614 F.3d 127, 133 (5th Cir. 2010) (citing *Bengivenga*, 845 F.2d at 597).

Because no single fact or circumstance results in *Miranda* custody, the Fifth Circuit has considered the following factors:

*First*, the length of the questioning;

*Second*, the location of the questioning;

*Third*, the accusatory or non-accusatory nature of the questioning;

*Fourth*, the amount of restraint on the individual's physical movement; and

*Fifth*, statements made by officers regarding the individual's freedom to move or leave.

*United States v. Coulter*, 41 F.4th 451, 458 (5th Cir. 2022) (citing *Wright*, 777 F.3d at 775). The Fifth Circuit calls this inquiry the "freedom-of-movement" test. *United States v. Palmer*, 111 F.4th 588, 594 (5th Cir. 2024).

The freedom-of-movement test is a necessary but not sufficient condition for *Miranda* to apply. *Maryland v. Shatzer*, 559 U.S. 98, 112, 130 S.Ct. 1213, 1224, 175 L.Ed.2d 1045 (2010); *Palmer*, 111 F.4th at 594. That is "because *Miranda* is to be enforced 'only in

7

those types of situations in which the concerns that powered the decision are implicated.'" *Id.* (quoting *Berkemer v. McCarty,* 468 U.S. 420, 437, 104 S.Ct. 3138, 3148–49, 82 L.Ed.2d 317 (1984)). So if a suspect's freedom of movement is restrained, the court must then ask whether officers applied "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509, 132 S.Ct. 1181, 1190 182 L.Ed.2d 17 (2012).

### III.    DISCUSSION

The dispositive question here is whether Galvan was in custody at any point during the March 19 interview. To make this determination, the Court examines the totality of the circumstances, giving particular attention to the five factors identified in *Coulter*: (1) the length of questioning; (2) its location; (3) whether it was accusatory in nature; (4) any physical restraints used; and (5) what officers said about the suspect's freedom to leave. 41 F.4th at 458.

Under this rubric, the Court finds that Galvan was not in custody at any point during the March 19 interview. Though it was a 47-minute interview, Valadez and Lerma repeatedly assured Galvan that they were not there to arrest him, conducted the interview in front of his family home, maintained largely non-accusatory tones despite moments of confrontation, employed no physical restraints, and concluded the encounter exactly as promised—without an arrest. Under these circumstances, no reasonable person would have understood their freedom to be restrained to the degree associated with formal arrest. *See Bengivenga*, 845 F.2d at 596. With that in mind, the Court briefly discusses each factor.

8

### A. LENGTH OF THE QUESTIONING

The first factor is the length of questioning. *Coulter*, 41 F.4th at 458. The interview's length of 47 minutes and 12 seconds, (Dkt. No. 76-2 at 00:00:26-00:47:38), is either neutral or weighs only slightly in favor of finding the interaction custodial.

The Fifth Circuit recently held that an interview of "about forty minutes" did not "weigh heavily on either side of the scale." *United States v. Gonzalez*, 814 F.App'x 838, 844 (5th Cir. 2020) (per curiam). And while interviews approaching an hour can raise "considerable suspicion" that an interview is custodial, *United States v. Harrell*, 894 F.2d 120, 124 n.1 (5th Cir. 1990), the Fifth Circuit "has warned against 'overreliance upon the length of questioning' because doing so 'injects a measure of hindsight into the analysis which it wishes to avoid,'" *United States v. Rafoi*, 60 F.4th 982, 1003 (5th Cir. 2023) (quoting *Coulter*, 41 F.4th at 458–59). Indeed, there is "no constitutional time limit" that automatically triggers *Miranda*. *Harrell*, 894 F.2d at 124.

In *Wright*, for example, the Fifth Circuit weighed an hour-long interview against many of the same factors present here and held that the interview was not custodial. 777 F.3d at 771, 777. The court explained that the interview's length—which did suggest custody—was outweighed by the repeated assurances that Wright was not under arrest, the lack of physical restraints, the fact that it took place near Wright's home, and the cooperative tone throughout. *Id.* at 777.

Here, the 47-minute interview is closer to what the court in *Gonzalez* found to be neutral. *See* 814 F.App'x at 844 (finding "about forty minutes" of interviewing did not "weigh heavily on either side of the scale"). And even if the interview's length is

9

marginally suggestive of custody, it is outweighed by the other factors discussed below. *See Wright*, 777 F.3d at 777.

### B. LOCATION OF THE QUESTIONING

The second factor is the location of the questioning. *Coulter*, 41 F.4th at 458. The interview's location weighs strongly against finding that Galvan was in custody. The conversation took place just outside Galvan's home, where he lived with his parents. (Dkt. No. 28 at 28); (Dkt. No. 76-2 at 00:33:34). "[T]he fact that the questioning occurred at the defendant's residence weighs in favor of a finding that the defendant was not in custody." *United States v. Augustine*, No. 5:07-CR-00008, 2007 WL 1673543, at *4 (S.D. Miss. June 7, 2007).

This case closely parallels *Coulter*, where the Fifth Circuit held that questioning "in front of the home where [the suspect] apparently lived with his parents," along with the fact that family members were apparently in the home at the time, weighed against a finding of custody. 41 F.4th at 459. As in *Coulter*, Galvan was questioned outside his home with family members nearby, rather than in a police vehicle or station house. (Dkt. No. 28 at 28); (Dkt. No. 76-2 at 00:33:34). Therefore, the interview's location weighs heavily against finding that he was in custody. *See United States v. Dixon*, No. 2:05-CR-00120, 2006 WL 2054390, at *2 (E.D. La. July 20, 2006) ("Courts consistently have held that *Miranda* warnings are not required during interrogations conducted at the suspect's residence because the defendant is not considered 'in custody.'" (collecting cases)).

### C.    NATURE OF THE QUESTIONING

The third factor is the accusatory or non-accusatory nature of the questioning. *Coulter*, 41 F.4th at 458. Courts evaluating this factor consider both "the tone of the interview (e.g., whether the conversation was cordial or cooperative) and the nature of the questioning (e.g., whether the questions were accusatory)." *United States v. Rider*, No. 4:20-CR-00232, 2022 WL 2815316, at *6 (E.D. Tex. July 1, 2022) (collecting cases). Here, the cordial tone and generally non-accusatory nature of the questioning weigh against finding that Galvan was in custody.

The agents maintained a friendly and cooperative tone throughout the interview. Valadez began cordially. (*See* Dkt. No. 76-2 at 00:26–00:28) ("Hey what's up dude. Osvaldo?"). He outlined for Galvan—twice, in fact—how the interview would go, emphasizing his intent to be "frank" and "totally clear from the get-go." (*Id.* at 00:02:08–00:02:19, 00:02:28–00:02:48). Lerma also added that the agents were not there to "BS" him. (*Id.* at 00:01:58–00:02:00). Valadez spoke consistently of "good faith." (*Id.* at 00:21:38–00:22:02, 00:25:36–00:25:56). And at one point, he told Galvan: "As a person, I'm here to help you if you have any questions or whatever." (*Id.* at 00:22:54–00:23:13). In short, Valadez and Lerma (who spoke infrequently) were polite and frank, even if being frank sometimes meant warning Galvan about potential consequences.

And while the agents were somewhat accusatory at times—warning about felony charges and telling Galvan he was "in a little bit of hot water"—those moments were consistently tempered by assurances that the agents were focused on bigger fish. (*Id.* at 00:13:20-00:14:01). Indeed, both agents repeatedly emphasized that they were "not after"

11

Galvan, with Valadez explicitly stating that he didn't "really care about" Galvan because he wasn't among those "taking the guns to Mexico." (*Id.* at 00:21:38-00:22:02, 00:13:20-00:14:01).

These statements are somewhat belied by Galvan's subsequent indictment.[2] (Dkt. No. 1). But as the Supreme Court explained, "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust." *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990). "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Id.* And thus the Fifth Circuit has found an interview non-custodial when the officers' statements led the suspect to believe—perhaps mistakenly—that he was not the "focal point" of the investigation. *Rafoi*, 60 F.4th at 1005 (quoting *Bengivenga*, 845 F.2d at 597 n.16). In *Rafoi*, the court found questioning non-accusatory where officers repeatedly told the suspect they "wanted [his] help" and that he was "only a witness, not a subject or target." *Id.* When someone is "identified as a mere witness tapped to help the government," they are more likely to believe that they are free to leave. *Id.* (citing *Bengivenga*, 845 F.2d at 597 n.16).

So too here. The agents consistently signaled that Galvan was not the investigation's "focal point" and that they needed his help to go after bigger targets. A reasonable person would not believe that he was the "focal point" of the investigation.

---

[2] Valadez actually told Galvan that he and Lerma "don't make the decisions on who to take to the judge and who not to take to the judge. The person who makes the decisions are called prosecutors, the lawyers, the federal prosecutors." (Dkt. No. 76-2 at 00:34:10–00:34:19).

*Rafoi*, 60 F.4th at 1005 (quoting *Bengivenga*, 845 F.2d at 597 n.16). While some of Valadez's warnings about lying were stern, the overall cooperative tone and repeated emphasis that Galvan was not the primary target weigh against finding that he was in custody. *See Coulter*, 41 F.4th at 459 (finding interview non-accusatory where police officer urged defendant to "be honest" and "real upfront with [him]" (alteration in original)).

The Fifth Circuit has also explained that if "the conversation was as much an opportunity taken by [the suspect] to tell his story to the officers as it was an opportunity taken by the officers to get information from [the suspect]," this weighs against a finding of custody. *Wright*, 777 F.3d at 777. Here, Galvan told the agents several times that he was just explaining "his part" in the events. (Dkt. No. 76-2 at 00:11:17–00:11:45) ("I'm telling y'all my part . . . like that's what I did.").

In sum, a reasonable person in Galvan's position would not have believed "that the interview would continue until" he confessed. *Rafoi*, 60 F.4th at 1005); *see Minnesota v. Murphy*, 465 U.S. 420, 433, 104 S.Ct. 1136, 1145, 79 L.Ed.2d 409 (1984) ("[T]he coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained."); *see also Gonzalez*, 814 F.App'x at 844 (holding that this factor weighed against custody where the agents' tone remained "measured" and "very professional" and where the conversation was as much an opportunity for the defendant to tell his story to the officers as it was for the officers to elicit information).

13

### D. RESTRAINT DURING THE QUESTIONING

The fourth factor is the amount of restraint on the individual's physical movement. *Coulter*, 41 F.4th at 458. Here, the complete absence of any restraint weighs against finding that Galvan was in custody.

Valadez testified—and the audio recording corroborates—that he never physically contacted Galvan beyond perhaps a handshake. (Dkt. No. 105 at 48). Galvan was not restrained in any way. (*Id.* at 29). When his mother arrived, Galvan felt free to reject Valadez's suggestion that they continue the conversation in Valadez's car. (Dkt. No. 76-2 at 00:34:30-00:34:33). In fact, Galvan felt free enough to move the conversation to a place of his choosing, ostensibly to avoid the rain. (*Id.* at 00:36:02-00:36:07). And when Galvan went inside to get his brother, Galvan returned, lingered nearby for a bit while Valadez interviewed the brother, and eventually went back inside. (Dkt. No. 105 at 52–53).

In short, nothing in the record suggests that Galvan faced any meaningful restraint—physical or otherwise—on his freedom to move.

### E. STATEMENTS MADE DURING THE QUESTIONING

The fifth factor is whether officers made statements about the individual's freedom to leave. *Coulter*, 41 F.4th at 458. This factor weighs strongly against finding that Galvan was in custody. The Fifth Circuit has held that "[i]nforming a suspect he is 'not under arrest, even without explicitly telling him he is free to leave, would also suggest to a reasonable person that he is free to leave.'" *Id.* at 461 (cleaned up) (quoting *United States v. Ortiz*, 781 F.3d 221, 231 (5th Cir. 2015)).

14

Here, from the outset, Valadez repeatedly emphasized that he was not there to arrest Galvan. Valadez told Galvan at least six times that the agents were not there to arrest him or that they would leave after the conversation:

> VALADEZ: If I were here trying to, like, arrest somebody, I'd be here, like, with a vest on putting you in handcuffs. But I'm—I want to talk to you, and then I want to leave. That's what I'm going to do, okay?

(Dkt. No. 76-2 at 00:02:19–00:02:25).

> VALADEZ: If—if you were to continue to lie to me, man, *the next time* I come and talk to you, man, we're going to have to put you in handcuffs and you're going to have to go to jail for a good while, okay.
>
> But I'm not—I don't really care about you . . . .
>
> GALVAN: *Sí, sí, sí. Claro.*

(*Id.* at 00:13:20–00:14:01) (emphasis added).

> VALADEZ: . . . We just want to get some stuff to help us with our thing, and we're driving away. That's—that's the reason we're here.

(*Id.* at 00:15:08–00:15:14).

> VALADEZ: Yeah, we're about to get in our vehicle, and we're about to leave dude.

(*Id.* at 00:21:38–00:22:02).

> VALADEZ: If I wanted to, we could take you to jail. *I don't care to do that*. If you were to continue to lie to me, I'm going to have to. But I don't care to do that. All I want is the guy up here, right?

(*Id.* at 00:24:03–00:24:15) (emphasis added).

> VALADEZ: . . . But I'm here in good faith just trying to work with you, okay. If I wasn't here in good faith, I'd be knocking

15

>> on your door saying, "Police with a search warrant, come to the door," okay? "Police with an arrest warrant, come to the door." I'm not here because of that, okay?

(*Id.* at 00:25:36–00:25:56).

"There is no hard-and-fast requirement that a suspect be told that he is free to leave in a non-custodial interview . . . ." *United States v. Alvarez*, 837 F.App'x 296, 300 (5th Cir. 2020) (per curiam). The Fifth Circuit has held that "agents implied that [a suspect] was free to terminate the questioning and leave" by "asking—rather than forcing—[the suspect] to participate in the interview" and by telling the suspect "that he was not under arrest." *Gonzalez*, 814 F.App'x at 843.

That is exactly what happened here. Valadez began the conversation by asking Galvan if he would be willing to speak with the agents. (Dkt. No. 76-2 at 00:02:28–00:02:33) ("VALADEZ: So I want to ask you some questions, man, just get some idea if you can give me some clarity about [another individual]. Right? GALVAN: Okay."). He then consistently and clearly told Galvan that the agents were not there to arrest him that day. (*Id.* at 00:02:19–00:02:25, 00:13:20–00:14:01, 00:15:08–00:15:14, 00:21:38–00:22:02, 00:24:03–00:24:15, 00:25:36–00:25:56).

A reasonable person hearing these statements would have understood that they were free to leave. *See Coulter*, 41 F.4th at 461; *Gonzalez*, 814 F.App'x at 843. As a result, this factor weighs against a finding of custody.

\* \* \*

In sum, the *Coulter* factors confirm that Galvan was not in custody for *Miranda* purposes during the March 19 interview. *First,* the interview's length of 47 minutes is

16

either neutral or weighs only slightly in Galvan's favor. *Second*, the location—in front of Galvan's family home—parallels *Coulter*, where the Fifth Circuit held that the location weighed against custody. *Third*, while the agents occasionally struck a confrontational tone, the overall tenor remained non-accusatory, with Valadez repeatedly emphasizing his focus on bigger fish. *Fourth*, Galvan was not physically restrained at any point. *Fifth*, Valadez's repeated assurances that he was not there to arrest Galvan would have conveyed to a reasonable person that they were free to end the encounter. Under these circumstances, no "reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Bengivenga*, 845 F.2d at 596.

## IV.   CONCLUSION

For the reasons above, Defendant's Motion to Suppress, (Dkt. No. 59), is **DENIED**.

IT IS SO ORDERED.

Signed on July 8, 2025.

_____
**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**